**Theodore SMITH, Plaintiff–Appellant,**

v.

**CITY OF CHICAGO, a Municipal Corporation, Defendant–Appellee.**

**No. 89–1436.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1990.

Decided Sept. 21, 1990.

Rehearing and Rehearing En Banc Denied Nov. 16, 1990.

Elizabeth Dale, Kenneth N. Flaxman, Chicago, Ill., for plaintiff-appellant.

L. Anita Richardson, Corp. Counsel, William R. Quinlan, Kelly R. Welsh, Asst. Corp. Counsel, Terence J. Moran, Office of the Corp. Counsel, Chicago, Ill., for defendant-appellee.

Before COFFEY, EASTERBROOK and MANION, Circuit Judges.

COFFEY, Circuit Judge.

Theodore Smith appeals from a judgment in a civil rights action he brought under 42 U.S.C. § 1983 that limited him to recovery of nominal damages in the amount of $1 for an alleged unconstitutional arrest. The judgment was entered pursuant to a pretrial agreement between Smith, the City of Chicago and individual defendants Jerry Springer, Richard O'Connell and Daniel Chilla, all officers or retired officers of the Chicago Police Department. The pre-trial agreement stipulated that Smith was to

receive an award of $1 in nominal damages from the City of Chicago. Further, the parties stipulated that there was no admission of liability on the part of the City or of the individual defendants, and Smith retained the right to file an appeal of the trial court's ruling on a motion *in limine* that had prevented him from seeking "relief for damages related to, or arising from, his criminal conviction," and had "limited [Smith] to seeking nominal damages."[1] We affirm.

## I.

### FACTS

This rape case arises from a woman's allegations that Theodore Smith sexually assaulted her on April 25, 1968. The woman reported the incident to the Chicago Police Department about 5 o'clock on that morning. According to a police report filed by two of the individual defendants, then Chicago Police Detectives O'Connell and Springer on May 26, 1968, the police officer who responded to the call was given a "service tag" the woman had obtained that listed Smith's name and the address where the rape allegedly occurred.[2] The officer took the woman to Billings Hospital where she was examined by a physician who, as was part of the examination, took a vaginal swab to ascertain the presence of semen, which proved negative.

According to his affidavit, defendant Daniel Chilla, then an evidence technician for the Chicago Police Department, stated that he was assigned to pick up the woman's vaginal swab sample from Billings Hospital on the morning of April 25, 1968. He further stated in his affidavit that he

picked up the sample from an employee he noted at the time to be "R. Brown," although he had no present recollection of the employee's identity. However, Ralph Brown, an employee of the hospital, filed an affidavit stating that he did not give the vaginal swab of the rape victim to any Chicago police officer. Chilla's affidavit then states that he took the swab to the Chicago Police Department's Crime Laboratory. Joseph Price, a micro-analyst in the police laboratory, filed a report in the "Shirley Johnson Rape Investigation" dated April 26, 1968, that stated that he had received a "vaginal swab identified as having been taken from the victim at Billings Memorial Hospital," from Evidence Technician Chilla on April 26, 1968, and that "[m]icroscopic examinations of the [vaginal swab] revealed the presence of human spermatozoa. . . ."

On April 28, 1968, the victim went to a Chicago police station to view photographs of known sex offenders.[3] She identified a photograph of Theodore Smith as that of her attacker. The rape case was assigned to defendants Springer and O'Connell, Chicago police detectives, both of whom had prior contact with Smith. Smith asserts in an affidavit that he had paid these officers $110 as a bribe to fix a battery charge earlier in 1968. Smith also asserts that O'Connell and Springer confronted him on April 28, 1968, and told him that unless he paid the officers he would be arrested and charged with rape. Smith claims that he told Springer and O'Connell that he would not pay the bribe on May 7, 1968.[4]

On May 8, 1968, the rape victim signed a sworn complaint for preliminary examination stating that Smith had raped her on

1. The agreement further provided that the City was to pay Smith's attorney $5,000 in attorneys' fees.

2. The record does not explain the term "service tag."

3. None of the named defendants are alleged to have been involved in the picture identification.

4. Although Smith contends that these facts are asserted in an affidavit attached to a response to summary judgment filed earlier in the case, our examination of this affidavit only reveals

Smith's assertions concerning the bribe paid to the officers concerning the battery charge and does not contain the facts relevant to the alleged bribery for a coverup of the rape charge. In addition, both Springer and O'Connell have filed affidavits denying any contact with Smith from the time they were assigned to the case until Smith's first court appearance on May 11, 1968. However, this factual discrepancy is not dispositive and, for purposes of this decision, we will accept Smith's allegations concerning the officers' attempt to solicit a bribe as true.

April 25, 1968. Springer and O'Connell then took the rape victim before Judge Daniel J. Ryan of the Cook County Circuit Court and the victim told Ryan that Smith raped her. The judge issued a warrant dated May 8, 1968, for Smith's arrest on the rape charge.[5]

Smith was convicted of rape in a bench trial in Illinois state court. At trial the victim testified that Smith raped her, while Smith testified that there had been an agreement between the victim and himself for a paid sexual encounter, that he became afraid, and that no sexual activity resulted. When testimony had concluded, Smith's attorney and the state's attorney agreed to the admission of both the negative vaginal swab test for sperm performed at Billings Hospital as well as the positive test performed in the police laboratory. In finding Smith guilty of rape, the state court judge appeared to rely solely upon a judgment concerning the credibility of the testimony that had been given by the rape victim and by Smith, stating:

"In reviewing all this I—while the defendant was on the stand—I'm sorry about what his problem was, but four or five different places, even though they may be called small, he gave me the impression that I just couldn't believe him.

"As I read the rape cases, it is easy to challenge and hard to prove and hard to defend against but immediately after leaving the place, she had a conversation with a roommate. Police came. They came to the same building. She saw pictures. Pointed him out. That was the man. Even though he was arrested some 12 or 13 days later.

"I can see no reason why the young lady would say these things. I can see why he would say he didn't, because he's the defendant.

"Because of the discrepancies that I marked down, whether he was confused or not, I don't know about when he went

to work, about when he went to the tavern, the difference in the amounts of money he offered her, the threatening, if there was the threatening, four or five different discrepancies in his testimony— the other gentleman that testified for him admitted he heard nothing, didn't see anything except them walking down the street. Didn't know anything. Didn't hear what was said.

"So, I think for those reasons there will be a finding of guilty. There will be a judgment on the finding."

In reaching his finding the judge mentioned neither the presence of sperm found in the police laboratory report nor the absence of sperm in the hospital laboratory report. Smith unsuccessfully challenged his convictions on direct appeal and in both state and federal habeas corpus proceedings.

After Smith was released from prison, he filed this suit under 42 U.S.C. § 1983 asserting that Springer, O'Connell and Chilla deprived him of his constitutional right to due process. Smith believed that the positive laboratory report concerning the presence of semen that the police had performed was fabricated because the police had not received a genuine vaginal swab of the rape victim. Smith based this belief initially upon his position that there was no employee of Billings Hospital in 1968 with the name of R. Brown and later upon his discovery that while there was such an employee, that employee did not furnish the vaginal swab sample to the Chicago Police Department.[6] The district court originally dismissed Smith's action on the ground that it was an improper attempt to utilize 42 U.S.C. § 1983 to collaterally attack a state court conviction. However, we reversed that conclusion in *Smith v. Springer*, 859 F.2d 31, 34 (7th Cir.1988), holding:

"The defendants apparently read this complaint as stating that Smith can only

---

5. Smith was arrested by an Officer Reed who has not been named as a defendant.

6. Smith furnished the court with an affidavit of Ralph M. Brown that stated that a "policeman of the Chicago Police Department, to the best of

my knowledge did not pick-up a test tub [sic] and a smear, taken by Dr. Young Rok Kim from the allege [sic] rape victim ... from me at the University of Chicago Hospital and clinics."

prevail on his section 1983 claim if his conviction is invalid. This is not necessarily so. Smith need not legally attack the validity of his conviction to prevail on his section 1983 claim if he can prove that the defendant's misconduct injured him. The causation element of section 1983 requires only that the plaintiff prove that the defendant, acting 'under color' of law, caused the deprivation of his constitutional rights. 42 U.S.C. § 1983. Smith, therefore, can prevail if he shows that the defendants fabricated evidence leading to his false arrest and subsequent unreasonable seizure, *see, e.g., Olson v. Tyler*, 825 F.2d 1116 (7th Cir.1987); *Bohannon v. Pegelow*, 652 F.2d 729 (7th Cir.1981) causing him to suffer damages."

We remanded Smith's case for further proceedings consistent with our opinion. *Id.* at 36.

After the case was remanded, the defendants filed a motion *in limine* seeking to bar recovery of "damages related to [Smith's] conviction and incarceration." As reflected in Smith's trial brief that was made part of the district court's pre-trial order, Smith believed that he was "entitled to compensatory damages for each day he was confined in the penitentiary as well as for lost earning opportunities caused by his felony conviction." The trial court granted the motion *in limine* holding that: "Plaintiff may not seek relief for damages related to, or arising from, his criminal conviction, and is limited to seeking nominal damages."

In light of the court's limitation on the damages Smith could be awarded, Smith, the individual defendants and the City of Chicago entered into an agreement that, without admission of fault on the part of the City or the individual defendants, judgment would be entered against the City for nominal damages in the amount of $1. The City would also pay Smith's attorney fees in the amount of $5,000. Under the agreement, however, Smith maintained the right to appeal from the district court's order on the motion *in limine,* and the parties stipulated that if his appeal was successful, the individual defendants and the City could contest their liability in further proceedings in district court. The trial court entered a judgment order reflecting the parties' agreement and substituting the City of Chicago for the individual police officers as the defendant in this case.

## II.

## LIMITATION OF RECOVERY TO NOMINAL DAMAGES

Smith's appeal focuses on the propriety of the trial court's ruling on the City's motion *in limine* that precluded Smith from receiving damages related to his incarceration and loss of employment opportunities as a result of his criminal conviction and that limited Smith to nominal damages. Because any amount of recovery of compensatory damages would necessarily be in addition to the $1 in nominal damages that Smith received, the Court's determination that Smith could be awarded only nominal damages precludes any award of compensatory damages. Thus, we will turn initially to the potentially dispositive issue of whether the trial court properly limited Smith's recovery to nominal damages.

As we held in a previous decision in this matter, "Smith ... can prevail if he shows that the defendants fabricated evidence leading to his false arrest and subsequent unreasonable seizure causing him to suffer damages." *Smith*, 859 F.2d at 34 (citations omitted). Thus, in order for Smith to recover compensatory damages, he must demonstrate that he suffered damages as a result of a constitutionally improper arrest.

In *Carey v. Piphus*, 435 U.S. 247, 260, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1978), the Supreme Court held that a constitutional deprivation would not allow the recovery of compensatory damages if the injured party could or would have suffered the same injury even if the alleged constitutional violation had not occurred. The Court held:

"In this case, the Court of Appeals held that if petitioners can prove on remand that '[respondents] would have been suspended even if a proper hearing

had been held,' 545 F.2d, at 32, then respondents will not be entitled to recover damages to compensate them for injuries caused by the suspensions. The court thought that in such a case, the failure to accord procedural due process could not properly be viewed as the cause of the suspensions. The court suggested that in such circumstances, an award of damages for injuries caused by the suspensions would constitute a windfall, rather than compensation, to respondents. We do not understand the parties to disagree with this conclusion. Nor do we."

435 U.S. at 260, 98 S.Ct. at 1050 (citations and footnote omitted). Although compensatory damages could not be recovered for a constitutional violation, absent a demonstration of actual injury resulting from the constitutional violation, an award of nominal damages would still be appropriate:

"Because the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury. We therefore hold that if, upon remand, the District Court determines that respondents' suspensions were justified, respondents nevertheless will be entitled to recover nominal damages not to exceed one dollar from petitioners."

*Carey*, 435 U.S. at 266–67, 98 S.Ct. at 1054 (citations and footnotes omitted).

In order to recover more than nominal damages, Smith must demonstrate that the fabricated evidence resulted in an absence of probable cause for his arrest, meaning that he would not have been lawfully arrested in the absence of the fabricated evidence. Indeed, we have gone so far as to hold that there is not even a constitutional violation when there is a basis for a conclusion that probable cause supports a person's arrest:

"Schertz's claim—that the investigating officers harbored malicious motives toward him—does not address an issue material to the disposition of this case. Regardless of the defendant's motives toward the plaintiff, the existence of probable cause for arrest is an absolute bar to a Section 1983 claim for unlawful arrest, false imprisonment, or malicious prosecution. If, however, the finding of probable cause is based on the defendant's intentional misrepresentation or concealment of material facts, the plaintiff may be able to proceed on a Fourth Amendment claim challenging the reasonableness of an arrest. In this case Schertz does not claim that the defendants concealed or misrepresented facts actually known to them; therefore the existence of probable cause bars plaintiff's Section 1983 claim."

*Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir.1989) (citations omitted). *See also Olson v. Tyler*, 825 F.2d 1116, 1117 (7th Cir.1987) ("In general, if probable cause supports an arrest warrant, an arrest pursuant to that warrant is valid even if events later prove the charges inaccurate...."); *Mark v. Furay*, 769 F.2d 1266, 1268–69 (7th Cir.1985) ("This court has consistently held that the existence of probable cause for an arrest totally precludes any section 1983 claim for unlawful arrest, false imprisonment, or malicious prosecution, regardless of whether the defendant had malicious motives for arresting the plaintiff.").

Several factors in this case clearly establish probable cause. Initially the rape victim identified Smith from an array of photographs as the man who sexually assaulted her. The victim signed a sworn complaint alleging that Smith had raped her. Further, the victim also appeared in person before the judge and stated that Smith had raped her. A warrant for Smith's arrest for the rape was issued and thereafter Smith was arrested. The combination of the victim's photo identification of Smith, her sworn complaint and her statement to the judge that Smith raped her certainly provide the probable cause necessary to justify Smith's arrest. Because the rape

victim's identification of Smith as her attacker and her declarations in the criminal complaint clearly supported a probable cause determination, we are convinced that Smith would have been lawfully arrested for sexual assault even if the defendants had been involved in the falsification of the police laboratory report regarding the presence of sperm. Thus, because probable cause existed for Smith's arrest and he would, thus, have been arrested in the absence of the defendants' alleged unconstitutional conduct, Smith has failed to suffer actual damages from the asserted constitutional deprivation, and his recovery was properly limited to nominal damages. The judgment of the district court is

AFFIRMED.